UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| JOSEPH MURCHISON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:14 CV 102 DDN |
| | ) | |
| v. | ) | |
| | ) | |
| KARMA NIEMEYER, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM REGARDING SUMMARY JUDGMENT**

This action is before the court on the second motion of defendants Karma Niemeyer, Melanie Powell, Michael Weis, and Theresa Salmons for summary judgment. (Doc. 66). The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 19). The court heard oral arguments on this matter on September 22, 2017. For the following reasons, the motion is granted.

**I. BACKGROUND**

In his first amended complaint, plaintiff Joseph Murchison alleges he was incarcerated by the Missouri Department of Corrections at the Northeast Correctional Center ("NECC") at all times relevant to this lawsuit. (Doc. 50 at 1.) On November 14, 2013, he alleges he was attacked by another prisoner, which left him with an injured fifth digit on his left hand ("little finger"). He alleges this "finger was bent or unable to flex, and [was] left at a roughly 20 [degree] angle to the rest of his fingers. The bend in Plaintiff's finger is at the very end or lst joint in the digit," with resulting swelling and pain. (*Id.* at ¶ ¶ 11, 12). Plaintiff alleges that the defendant NECC medical personnel

were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment to the United States Constitution.

On October 31, 2014, plaintiff commenced this action under 42 U.S.C. § 1983 against defendants Corizon Medical Services NECC Medical Director, Jane Doe Nurse, Jane Doe Nurse #1, Jane Doe Nurse #2, Jane Doe Nurse #3, James Hurley, George Lombardi, Missouri Department of Corrections Regional Health Services Director, and Corizon Medical Services Regional Medical Director, all in their individual and official capacities. (Doc. 1.) On January 5, 2015, District Court Judge Jean C. Hamilton dismissed the claims against defendants Corizon Medical Service NECC Medical Director, James Hurley, George Lombardi, Missouri Department of Corrections Regional Health Services Director, and Corizon Medical Services Regional Medical Director, in their individual and official capacities. (Docs. 6, 7.) On the same day, Judge Hamilton also dismissed the claims against Jane Doe Nurses #1-3 and John Doe Nurse in their official capacities. (*Id.*) On March 13, 2015, plaintiff provided the names of the Jane and John Doe Nurses as Karma Niemeyer, Melanie Powell, Michael Weis, and Theresa Salmons. (Doc. 13.) This court corrected the identities of the remaining defendants accordingly. (*Id.*)

Plaintiff filed his first amended complaint on September 7, 2016. (Doc. 50). Remaining for disposition are the following claims:

(1) Count I, alleging a failure to use adequate procedures with deliberate indifference against defendants Niemeyer, Powell, Weis, and Salmons (Doc. 50 at ¶¶ 36-49) and

(2) Count II, alleging intentional infliction of emotional distress against defendants Niemeyer, Powell, Weis, and Salmons. (*Id.* at ¶¶ 50-63).

These Counts are against the respective defendants in their individual capacities only. (Doc. 7). Plaintiff seeks nominal damages, compensatory damages, punitive damages, attorney fees, and costs. (Doc. 50 at 13-14).

Defendants filed their first motion for summary judgment in January 2016, but it was denied without prejudice upon the agreement of the parties because of a variety of

delays in the discovery process. Defendants renewed their motion for summary judgment on June 20, 2017. (Doc. 66).

## II. SUMMARY JUDGMENT PRINCIPLES

Summary judgment is proper "if there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party." *Shrable v. Eaton Corp.*, 695 F.3d 768, 770 (8th Cir. 2012); *see also* Fed. R. Civ. P. 56(a). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). A fact is "material" if it could affect the ultimate disposition of the case, and a factual dispute is "genuine" if there is substantial evidence to support a reasonable jury verdict in favor of the nonmoving party. *Rademacher v. HBE Corp.*, 645 F.3d 1005, 1010 (8th Cir. 2011). The court must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences. *Scott v. Harris*, 550 U.S. 372, 379-80 (2007). The burden shifts to the non-moving party to demonstrate that disputes of fact do exist only after the movant has made its showing. *Id.*

Motions for summary judgment are typically ruled on showings of evidence by affidavit. However, affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). "When an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment." *Brooks v. Tri-Sys., Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005).

## III. UNDISPUTED FACTS

The record establishes that, unless otherwise stated, the following facts are without genuine dispute. Plaintiff was a prisoner incarcerated by the Missouri Department of Corrections ("MDOC") at the Northeast Correctional Center from November 14, 2013, to May 12, 2014. (Doc. 68 at ¶ 1). During this time, Corizon, LLC, was under contract

with the State of Missouri to provide medical care to MDOC prisoners, and employed at NECC defendants Karma Niemeyer and Melanie Powell as Licensed Practical Nurses, defendant Michael Weis as a part-time, as-needed Nurse, and Theresa Salmons as a Licensed Practical Nurse on temporary assignment to NECC. (Doc. 68 at ¶¶ 2-6).

On November 14, 2013, plaintiff was involved in a physical altercation with another prisoner. (Docs. 68, 72, and 78 at ¶ 7). NECC officers intervened and sprayed pepper gas on plaintiff in order to stop the altercation. (Doc. 68 at ¶ 8). After this use of force, the officers ordered plaintiff to be placed in administrative segregation ("ad-seg"). (Docs. 68, 72, and 78 at ¶ 9). Before being placed in ad-seg, and pursuant to NECC Standard Operating Procedure 11-39, defendant Niemeyer examined plaintiff for the presence of any acute illnesses or injuries that would preclude ad-seg confinement. (Docs. 68 and 72 at ¶¶ 10-15). During defendant Niemeyer's evaluation, plaintiff complained of an injury to and bleeding from the inside of his lower lip, a sore left elbow, and a sore left little finger. (Docs. 68 and 72 at ¶ 16). Plaintiff reported that he had a history of exercise-induced asthma and defendant Niemeyer noted he was short of breath and having difficulty breathing. (Docs. 68 and 72 at ¶ 17). Plaintiff was handcuffed for the entirety of defendant Niemeyer's assessment. (Docs. 72 and 78 at ¶ 8).

Defendant Niemeyer recorded the following findings in plaintiff's chart: he had two pea-sized, H shaped open areas on the inside of his lip near the skin fold at the base of his bottom row of teeth; he had mild erythema with no visible or palpable edema to his left elbow; he had no erythema, edema, open areas or obvious deformity to his left little finger; and although he exhibited pain and stiffness with movement of that finger, he retained a passive full range of motion in it. (Docs. 68, 72, and 78 at ¶ 18). To test plaintiff's injured finger, defendant Niemeyer took his hand and made it into a fist to ensure that she did not hear any crunching, rubbing, popping, or grinding in the finger. (Docs. 68 and 78 at ¶ 19). She did not note in the medical chart any swelling, redness, or complaint that plaintiff could not move it on his own. (Docs. 68 and 78 at ¶¶ 20-21). Plaintiff alleges that regardless of defendant Niemeyer's records and testimony, she failed

to conduct a full evaluation of him or determine whether he had *active* range of motion. (Docs. 72 and 78 at ¶¶ 7, 18, 20-21). However, he did not provide any further details or evidence in the record to support this allegation. (*Id.*)[1] Plaintiff also argues that Nurse Niemeyer told him there was nothing she could do, and that he just had to "deal with it" until it healed or stopped hurting on its own. (Doc. 72 at ¶ 4). Plaintiff argues that when he asked defendant Niemeyer for pain medication, she told him to wait for the sick call and fill out a Medical Services Request. (Doc. 72 at ¶ 5).

Although plaintiff alleges he believed his injury was an emergency situation, defendant Niemeyer determined that plaintiff's complaints, including his injured left little finger, was not an emergency. (Doc. 68 at ¶ 24; Docs. 72 and 78 at ¶ 25). Accordingly, she did not report that he had any urgent medical needs or refer him to a practitioner for further evaluation. (Docs. 68 and 78 at ¶¶ 25, 30, 31). Instead, she instructed plaintiff on the Medical Services Request ("MSR") procedure in administrative segregation. (Docs. 68 and 72 at ¶ 27). This procedure requires that a prisoner stand at the window of the cell door when the nurse(s) assigned to the administrative segregation unit make daily morning rounds. (Docs. 68 and 72 at ¶ 39-40). The nurses pass out MSRs upon request. (Docs. 68 and 72 at ¶ 39). Defendant argues that prisoners know that the nurse is approaching his cell door when he hears the nurse interacting with prisoners and the banging on the doors of the cells next to him. (Docs. 68 and 78 at ¶ 41). Plaintiff alleges, however, that there is no announcement that the nurse is making rounds. (Doc. 72 at ¶ 41). Defendant alleges that, if a prisoner desiring an MSR is not standing at his cell door when the nurse approaches his cell, he will not receive an MSR form to fill out; if he requests an MSR form after the nurse has passed his cell door, he will not receive one that day. (Docs. 68 and 78 at ¶¶ 42-43). Plaintiff denies these allegations, because they are directly based on official NECC policy. (Doc. 72 at ¶¶ 42-43). However, the parties agree that the nurse will not go back to a prisoner's cell after passing it, to ensure

---

[1] Additionally, plaintiff never controverts defendant Niemeyer's record regarding his *passive* range of motion.

that the process remains efficient and does not hinder the performance of other nursing duties. (Docs. 68 and 72 at ¶ 45).

During the time Nurse Niemeyer was assessing him for possible transfer to administrative segregation, plaintiff's hands were cuffed for approximately 30 to 60 minutes. (Docs. 68, 72, and 78 at ¶ 35). Plaintiff could not tell if his left little finger was swollen when his hands were cuffed. (Docs. 68, 72, and 78 at ¶ 36). Swelling might not appear in an injured finger until one or more hours after an injury. (Docs. 68, 72, and 78 at ¶ 38). Plaintiff first noticed the swelling to his left little finger when he was placed in his cell and the handcuffs were removed. (Docs. 68 and 72 at ¶ 37).

The next morning, on November 15, 2013, plaintiff was awake and sitting on the bunk in his cell, (Docs. 68 and 72 at ¶¶ 46-48), when he became aware that defendant Powell was making medical rounds in the administrative segregation unit; he knew this, because he heard the chuckhole of the cell next to him opening and closing. (Docs. 68 and 72 at ¶ 47). Defendant Powell alleges that when plaintiff reached the window of his cell, she had already passed by it. (Docs. 68 and 78 at ¶ 49). Plaintiff claims that he reached the window of his cell "just as" defendant Powell was walking by. (Doc. 72 at ¶ 49, ¶ 10). Plaintiff alleges that he called out to her and requested an MSR, but that she responded, "You should have been at the window when I walked past." (Doc. 72 at ¶ 50, ¶ 11). Defendant Powell has no independent recollection of plaintiff calling out to her for an MSR or to look at his left little finger after she passed his cell. (Docs. 68 and 78 at ¶ 50). The parties agree that any prisoner who desires an MSR form, medicinal refills, information about medication, and or other medical services while in administrative segregation must be standing at the window of the cell door at the time the nurse approaches the cell door. (Docs. 68 and 72 at ¶ 40). Though the parties disagree on whether this is an "official" NECC policy, they agree that the nurse will not go back to the prisoner's cell after passing it, because this would result in delays and hinder the performance of other nursing duties. (Docs. 68 and 72 at ¶¶ 40-42).

On November 17, 2013, plaintiff obtained and completed an MSR, complaining of "pain/allergies." (Docs. 68 and 72 at ¶ 52). In response to this MSR, plaintiff saw

defendant Weis at nursing sick-call on November 23, 2013. (Docs. 68 and 72 at ¶ 53). Plaintiff complained that he could neither fully extend nor curl his injured left little finger due to pain and swelling. (Doc. 72 at ¶ 12). Plaintiff alleges that defendant Weis examined his finger while plaintiff was handcuffed and straightened plaintiff's finger, and that plaintiff complained that the straightening caused more pain. (Doc. 72 at ¶ 13). Plaintiff alleges that defendant Weis then asked him to flex his finger and make a fist. (Doc. 72 at ¶ 13). Defendant Weis' examination of plaintiff's left little finger revealed some swelling, but no heat, redness, or discoloration. (Docs. 68 and 72 at ¶ 54). Defendant Weis also observed that the affected joint retained a full range of motion. (*Id.*). Weis alleges he provided plaintiff with ibuprofen for pain and instructed him to perform range-of-motion exercises, apply warm compresses for the joint pain and swelling, and return to sick-call if the symptoms or severity increased. (Docs. 68 and 78 at ¶ 55). Plaintiff alleges that he was only provided with ibuprofen and did not receive any further treatment; he elsewhere claims Weis recommended he use a warm compress and limit joint movement. (Doc. 72 at ¶ 55, ¶ 14; Doc. 72, Ex. 1 at ¶ 21). Plaintiff alleges both that defendant Weis informed him that he would request a referral and that he did not think a physician's examination was necessary. (Doc. 72 at ¶ 58, ¶ 13). Defendant Weis has no recollection of telling plaintiff he would refer him to a physician, and he did not note a referral in the medical chart, because he determined that (1) plaintiff's finger may have stabilized and might be improving, and (2) plaintiff did not meet the criteria to be seen by a doctor. (Docs. 68, 72, and 78 at ¶¶ 57-59).

On November 29, 2013, plaintiff completed and submitted another MSR form complaining of pain in his left little finger, difficulty bending it, and pain that was nonresponsive to the ibuprofen. (Docs. 68 and 72 at ¶ 60). He saw defendant Nurse Theresa Salmons at nursing sick-call that day. (*Id.*) Defendant Salmons reviewed plaintiff's medical history and medications and examined his left little finger. (Docs. 68 and 72 at ¶ 61). Plaintiff alleges that she stated "it's just a phalange." (Doc. 72 at ¶ 16). Her records note plaintiff's finger now had swelling, tenderness, and discoloration, and he could not bend and straighten it. (Docs. 68 and 72 at ¶ 61). Defendant Salmons

provided plaintiff with Tylenol for pain, "buddy-taped" the left little finger to the fourth finger, and instructed plaintiff to perform range-of-motion exercises and apply warm compresses. (Docs. 68, 72, and 78 at ¶ 62). Plaintiff alleges that he requested a finger splint from defendant Salmons but did not receive one. (Docs. 72 and 78 at ¶ 17). Defendant argues that splints are not carried at NECC sick-call, because they have metal in them and can be used as weapons. (*Id.*)

Defendant Salmons alleges she also referred plaintiff to a medical practitioner for further evaluation, because plaintiff's finger had decreased range of motion, it was swollen, and his pain had not responded to the previously-provided ibuprofen. (Docs. 68 and 78 at ¶¶ 62-63). Her medical notes included this referral. (Docs. 68 and 78 at ¶¶ 62-64). She alleges she delivered this referral to the office of NECC's Health Services Administrator ("HSA") the same day. (Doc. 68 at ¶ 64). Because the HSA was not in her office, and the office door was locked, defendant Salmons states she slid it under the HSA's office door, so that plaintiff could be scheduled for an appointment with a practitioner as soon as possible. (Doc. 68 at ¶ 65). Plaintiff denies that defendant Salmons ever referred him to a practitioner, because he was not scheduled for a doctor's appointment until a third party intervened. (Doc. 72 at ¶¶ 62-65, ¶¶18-19). Plaintiff alleges that in mid-December, he went to see NECC's Director of Nursing, and it was this director who scheduled plaintiff for an appointment to see a physician. (Doc. 72 at ¶ 67, ¶ 19).

On January 2, 2014, plaintiff saw Tomas Cabrera, M.D., who examined plaintiff's left little finger and ordered x-rays of his left hand. (Docs. 68, 72, and 78 at ¶¶ 67-68). The x-rays were sent to a radiologist for review and interpretation. (Doc. 68 at ¶ 75). The radiologist did not observe any fracture or dislocation, but noted on January 9, 2014, that there was an extensor tendon injury to the left little finger. (Docs. 68 and 72 at ¶ 76).

On January 27, 2014, a second doctor, Thomas Pryor, M.D., examined plaintiff's left little finger and reviewed the x-rays, opining that plaintiff had a torn extensor

ligament/tendon with secondary "mallet finger,"² but no fracture. (Docs. 68 and 72 at ¶ 78). Dr. Pryor opined that, even if plaintiff had been referred to a physician before November 23, 2013, there is no guarantee that his injured little finger would have returned to its normal position, since it involved a torn ligament. (Docs. 68, 72, and 78 at ¶ 90).³ He also opined that the treatment provided to plaintiff's finger by defendants Niemeyer, Weis, and Salmons was medically appropriate. (Docs. 68, 72, and 78 at ¶ 91).

Dr. Pryor referred plaintiff to an outside orthopedic surgeon, Dr. Joyce Wilson. Plaintiff saw the orthopedic surgeon on February 24, 2014, and she diagnosed plaintiff with a ruptured tendon in the left little finger. (Docs. 68 and 72 at ¶¶ 82-83). She determined that surgery was not necessary and prescribed and fitted plaintiff's finger with an extension splint. (Docs. 68 and 72 at ¶ 84). Plaintiff saw the orthopedic surgeon for two follow-up visits, on April 21 and May 12, 2014. (Docs. 68 and 72 at ¶ 85). She observed that his left little finger had only a ten-degree lag, which she considered to be mild and a very good result. (Docs. 68 and 72 at ¶ 86). Although she noted plaintiff's finger still had mild swelling, she was not concerned as these injuries commonly produce swelling for six months or more. (Docs. 68 and 72 at ¶¶ 87-88). She opined that there were several reports of good results for mallet fingers treated as late as three to four months after injury. (Docs. 68, 72, and 78 at ¶ 89). She also stated that "with any injury I guess you like to treat it as soon as possible." (Doc. 72 at ¶ 89).

---

² "Mallet finger" occurs when the tendon of a finger's end-joint, also known as the distal interphalangeal joint ("DIP"), has either ruptured or is fractured and leads to an "extensor lag." This condition occurs when an individual is not able to extend the finger completely without it drooping slightly at the DIP. (Doc. 68 at ¶¶ 79-80).

³ Plaintiff alleges that Dr. Pryor told him that he should have been seen by a physician within 14 days or so of his injury and that, because he was not seen right away the treatment may be ineffective. (Doc. 72 at ¶ 21). Plaintiff alleges that Dr. Pryor asked why he had not been referred to a physician earlier or received a splint. (*Id.*) Plaintiff further claims Dr. Pryor stated that he would likely have permanent damage, continued pain, and limited mobility. (*Id.*) However, out-of-court statements offered to prove the truth of the matter asserted are inadmissible hearsay, and plaintiff's allegations about what Dr. Pryor stated are not admissible for this purpose. *See Brooks v. Tri-Sys., Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005).

Defendant alleges that at all relevant times, plaintiff had the right to self-declare a medical emergency, if he was in fear of loss of life or loss of limb. (Docs. 68, 72, and 78 at ¶¶ 69-70). As of November 14, 2013, plaintiff believed that his left little finger needed urgent or emergency medical care because of the pain. (Docs. 68 and 72 at ¶ 71). He admits he had the right to self-declare a medical emergency generally, except when he was in defendant Niemeyer's presence on November 14, 2013. He denies that he could self-declare an emergency at that time, because he had been seen by medical personnel that day, defendant Niemeyer told him his only option going forward was to request an MSR form, and he required further loss of life or limb condition to self-declare at that point. (Doc. 68-8 at 39-42). However, plaintiff did not self-declare a medical emergency on November 14, 2013, or on November 15, 2013, or at any other time between November 14, 2013, and the date he saw a doctor, January 2, 2014. (Docs. 68, 72, and 78 at ¶¶ 72-73). Plaintiff alleges that at all relevant times, his finger injury was obvious to laymen. (Doc. 72 at ¶ 23).

## IV. Allegations of Deliberate Indifference

Plaintiff claims that defendants were deliberately indifferent to his serious medical need, relating to the injury to his left little finger, in violation of the Eighth Amendment, under 42 U.S.C. § 1983. To prevail on such a claim, plaintiff must prove that (1) he suffered from an objectively serious medical need, (2) the defendant knew of the condition, and (3) the defendant deliberately disregarded the complaint. *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). Deliberate indifference is "more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).

### A. Allegations of Deliberate Indifference against Defendant Niemeyer

Defendant Karma Niemeyer argues that she is entitled to summary judgment on Count I, because the care and treatment she provided to plaintiff during the administrative segregation assessment did not constitute deliberate indifference. (Doc. 67).

Plaintiff argues that there is a genuine dispute as to whether he suffered an injury obvious to a layperson, and that defendant Niemeyer ignored an "obvious deformity" in his finger, which he alleges was red and swollen at the time of her examination. (Doc. 73). However, even crediting plaintiff's allegations, defendant Niemeyer is entitled to judgment as a matter of law, because there is no genuine dispute of material fact with regard to the third element of plaintiff's deliberate indifference claim: whether defendant deliberately disregarded an objectively serious medical need. Defendant Niemeyer evaluated plaintiff's physical and mental fitness to be placed in administrative segregation. Even accepting plaintiff's allegation that his finger was bent, that he could not straighten it, and that it was red and swollen, defendant Niemeyer's evaluation notes state that the finger retained a full passive range of motion—in other words, even if plaintiff could not straighten his finger himself, she could bend and unbend the finger for him. She determined that plaintiff was not suffering from any acute injury that would preclude his placement in administrative segregation and that could not be addressed by the standard procedure for non-life-threatening medical attention: an MSR. Plaintiff timely received the assessment of his fitness to enter administrative segregation. Even if plaintiff's allegations are true, defendant Niemeyer's actions or inactions were not deliberate indifference.

### B. Allegations of Deliberate Indifference against Defendant Powell

Defendant Melanie Powell argues that she is entitled to summary judgment, because she denied plaintiff's MSR request according to policy and not with deliberate indifference. The parties agree that, if defendant Powell had gone back to plaintiff's cell after passing it, she would have established a precedent that would delay and hinder the performance of other nursing duties. Plaintiff argues that he has submitted evidence that he was at the door when defendant Powell walked past. (Doc. 73). However, plaintiff's

witness stated only that plaintiff rushed to the door and called out to defendant Powell several times; the witness did not state plaintiff was already at the door when defendant Powell walked by.  (Doc. 72, Ex. 2).  Defendant's own testimony is that he "went to the door and just as [he] got there she was walking by and [he] called out to her."  (Doc. 68, Ex. 8 at 11).  Moreover, plaintiff's first amended complaint states that "[b]y the time Plaintiff arrived at his cell door, Defendant Powell had passed Plaintiff's cell door and was at the door to his immediate left."  (Doc. 50, ¶ 19).  There is no assertion that plaintiff was waiting at the door before defendant Powell walked by, and, therefore, there is no genuine, material dispute as to this fact.  The parties agree that prisoners in administrative segregation must be at the door of the cell when the nurse making rounds arrives and that the nurse will not return to a door that she has already passed.  While this may not comport with the prisoners' desire, it does not rise to the level of deliberate indifference.  Nor has plaintiff challenged the practice itself.  Moreover, plaintiff had the choice to self-declare a medical emergency on this date, in which case he would be immediately evaluated by medical staff, but he never did do so.  Even viewing the facts in the light most favorable to plaintiff, defendant Powell's actions did not amount to deliberate indifference.

### C.  Allegations of Deliberate Indifference against Defendant Weis

Defendant Michael Weis argues that he is entitled to summary judgment on Count I, because there is no evidence he knew or should have known about plaintiff's finger injury before he examined plaintiff on November 23, 2013, and he provided adequate medical treatment.  He asserts that when he examined the finger, it was swollen, but there was no heat, redness, or discoloration, and plaintiff had full range of motion; so, it appeared that any injury may have stabilized and might be improving.  Plaintiff argues that there is a dispute of fact as to whether plaintiff's finger was red at the time of defendant Weis' examination and the level of treatment provided.  (Doc. 73 at 10). Defendant Weis claims he provided ibuprofen and instructed plaintiff to perform range of motion exercises and apply warm compresses.  Plaintiff claims he was only given

ibuprofen. Plaintiff also claims that defendant Weis told him he would refer him to a doctor, but defendant Weis has no recollection of this, and there is no referral noted in the medical chart. (Doc. 73 at 10).

Crediting plaintiff's allegation that defendant Weis only provided ibuprofen, there is still no evidence this treatment was improper or that it amounted to deliberate indifference. Defendant Weis' treatment of plaintiff was within his medical judgment as a nurse. Additionally, even if defendant Weis stated he would refer plaintiff to a doctor, his failure to do so may amount to at most negligence, not deliberate indifference.

D. Allegations of Deliberate Indifference against Defendant Salmons

Defendant Theresa Salmons moves for summary judgment on Count I because there is no evidence she acted with deliberate indifference in her treatment of plaintiff or that she knew or should have known of plaintiff's finger injury prior to her examination of him on November 29, 2013. On that date, defendant Salmons examined plaintiff's finger, gave him Tylenol, and buddy-taped his finger. Even if plaintiff requested a finger splint and defendant instead "buddy-taped" his finger, this is simply a disagreement with the course of treatment provided. Defendant Salmons also referred plaintiff to be seen by a medical practitioner. She noted so on the back of plaintiff's MSR and slid it under the door to the HAS's office. There is no evidence that the conduct of defendant Salmons rose to the level of deliberate indifference.

E. Evidence of the Effect of Delay on Plaintiff's Recovery As to All Defendants

The Constitution does not require that every medical complaint be handled as quickly as an inmate wishes. *Jenkins v. County of Hennepin*, 557 F.3d 628, 633 (8th Cir. 2009). "An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997). Accordingly, to withstand a motion for summary judgment on this claim, an inmate must submit sufficient evidence that the defendant

ignored an acute or escalating medical situation, or that delays adversely affected the inmate's prognosis. *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir. 1995).

Plaintiff has not submitted any evidence that any improper treatment or delay from the defendants exacerbated the injury to his finger. Defendants, on the other hand, have proffered evidence that the two- to three-month delay in treatment did not adversely affect plaintiff's recovery: (1) Dr. Pryor testified that a torn ligament might never return to its normal position, even if plaintiff had seen a doctor sooner, and (2) Dr. Wilson testified that plaintiff's finger healed with only a ten-degree lag, which she considered to be mild and a very good result. Dr. Wilson also testified that good results can occur for injuries like plaintiff's that are not treated until three or four months following the injury. (Doc. 68, Ex. 1; Docs. 68, 72, and 78 at ¶¶ 86-89). Plaintiff has not submitted any contradictory, verifying medical evidence establishing that delay had any detrimental effect in his case. The only evidence he has submitted is Dr. Wilson's statement that "with any injury I guess you like to treat it as soon as possible." This is insufficient to meet plaintiff's burden, and defendants Niemeyer, Powell, Weis, and Salmons are entitled to judgment as a matter of law. *See Crowley*, 109 F.3d at 502.

### VI. Allegations of Intentional Infliction of Emotional Distress

Under Missouri law, to establish a claim of intentional infliction of emotional distress, "(1) the defendant's conduct must be outrageous or extreme; (2) the defendant must act intentionally or recklessly; (3) there must be extreme emotional distress that results in bodily harm; (4) caused by the defendant's conduct; and (5) the conduct must be intended solely to cause extreme emotional distress to the victim." *Crow v. Crawford & Co.*, 259 S.W.3d 104, 119 (Mo. Ct. App. 2008).

Defendants argue that the allegations underlying plaintiff's claim of intentional infliction of emotional distress are not supported by any evidence from which a reasonable jury could conclude that defendants acted intentionally or recklessly, much less in a manner so outrageous, extreme, and atrocious as to go beyond all possible bounds of decency. Plaintiff responds that genuine disputes of fact exist as to this claim,

arguing that he suffered extreme pain in his hand and the defendants acted recklessly in ignoring plaintiff's complaints of pain.

Under the test adopted by Missouri courts for "extreme and outrageous" conduct, the conduct must be more than "malicious and intentional." *See* Polk v. INROADS/St. Louis, Inc., 951 S.W.2d 646, 648 (Mo. Ct. App. 1997). It must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hyatt v. Trans World Airlines, Inc.*, 943 S.W.2d 292, 298 (Mo. Ct. App. 1997). As the Restatement observes, "[t]he rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened . . . to occasional acts that are definitely inconsiderate and unkind." Restatement (Second) of Torts § 46 cmt. d (1965).

While the actions of some defendants may have been perceived by plaintiff to have been less than desired, plaintiff has not presented sufficient evidence for a reasonable jury to find that these actions were extreme or outrageous, as required to establish a claim of intentional infliction of emotional distress under Missouri law. *See Polk*, 951 S.W.2d at 648 (stating that for a defendant's conduct to be "extreme and outrageous" for purposes of an intentional infliction of emotional distress claim, the conduct "must be more than malicious and intentional"). No reasonable jury could find that defendants possessed a mental state akin to criminal recklessness in response to plaintiff's medical needs. Because the record before this court does not show any conduct that can be characterized as so extreme or outrageous as to be tortious, defendants are entitled to summary judgment on Count II of plaintiff's amended complaint.

## VII.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Doc. 66) is **SUSTAINED** in full.  An appropriate Judgment Order is issued herewith.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on December 19, 2017.